1 DAVID L. ANDERSON (CABN 149604)
United States Attorney

2

HALLIE HOFFMAN (CABN 210020)
3 Chief, Criminal Division

4 SAMANTHA SCHOTT BENNETT (NYBN 5132063)
Assistant United States Attorney

5
    1301 Clay Street, Suite 340S
6   Oakland, California 94612
    Telephone: (510) 637-3680
7   FAX: (510) 637-3724
    samantha.schott@usdoj.gov

8
Attorneys for United States of America
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                  OAKLAND DIVISION

13 UNITED STATES OF AMERICA,            ) CASE NO. 4-20-71541 MAG
                                        )
14         Plaintiff,                   ) UNITED STATES' MOTION FOR PRETRIAL
                                        ) DETENTION
15     v.                               )
                                        ) Requested Date:   November 10, 2020
16 DAYNA LYN ALEXANDER,                 ) Time:             10:30 a.m.
   AKA DAYNA LYN HUNTSMAN,              ) Court:            Hon. Jacqueline Scott Corley
17                                      )
         Defendant.                     )
18                                      )
                                        )
19 ────────────────────────────────────)

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Dayna Lyn Alexander, aka Dayna Lyn Huntsman, is a prolific identity thief, who has spent her adult life preying on vulnerable people and wreaking havoc on the financial lives of her victims and their families. In the instant case, she took over a victim's identity and accounts immediately upon learning of his death, and caused almost $150,000 in losses to his orphaned teenage son and elderly mother. She used the mail to divert account documents and debit/credit cards, and she used another victim's stolen identity to rent an apartment and to open bank accounts, into which she deposited and cashed funds stolen from the deceased man. She was arrested on a federal Criminal Complaint on October 28, 2020, and stands charged with Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 1349. The United States of America now moves to detain Defendant Dayna Alexander on the grounds that she is both a flight risk and danger to the community pursuant to 18 U.S.C. § 3142.

As described further below, Alexander's criminal history dates back to the mid-1990s, and she has felony convictions for identity theft and other deceit-related crimes from at least seven different incidents since 2007 alone. This includes a 2008 federal conviction for Theft of Mail and False Statements in a Loan Application in the Eastern District of California. After serving an initial 33-month prison term, Alexander repeatedly violated her supervised release – by committing more identity theft crimes – until her supervised release was revoked and she was sentenced to an additional 36-month term of imprisonment.

After she was released in November 2015, she picked up her criminal livelihood right where she left off. While apparently on probation, with multiple warrants out for her arrest and pending cases in numerous counties, and as described further below and in the affidavit supporting the Criminal Complaint, Alexander sought out victims who died suddenly and immediately usurped their accounts and identities, causing significant financial and emotional damage to their families, who had to sort through the messes that the defendant created for them. As detailed further below, while in custody for other matters, she even sent a how-to guide to a co-conspirator, detailing how to commit the identity theft and fraud scheme, in which she encouraged the co-conspirator to search obituaries and news articles regarding mass casualty incidents in order to identify victims. She then listed several questions

to ask about the potential victim, and if any questions were answered affirmatively, she instructed the co-conspirator to "skip to the next body."

When in custody for other matters, Alexander persuaded others to provide false documents to the court, to lie to her probation officer, and to use victims' stolen information in order to post her bonds. Alexander's conduct in this case, her prior failures to abide by conditions of supervision and to appear in court, her disrespect for the court, and her evident willingness to put her interests before the community, demonstrate that no condition or combination of conditions can reasonably assure the safety of the community or the defendant's future appearance in court. Accordingly, the Court should order the defendant detained.

## BACKGROUND

### I. OFFENSE CONDUCT

The affidavit supporting the Criminal Complaint describes the defendant's conduct in significant detail, and the government will only summarize the defendant's conduct here. Between at least January 2019 and continuing through at least February 2020, the defendant and others, known and unknown, operated a mail fraud scheme by which they identified individuals who passed away suddenly and took over their identities and accounts within days of their death. The defendant spearheaded the efforts, identifying the victims, locating their personal identifying information, and changing passwords and addresses on their bank and credit card accounts. The defendant would then have checks issued from their accounts by mail, or would have access devices mailed so she and other co-conspirators could obtain funds from their accounts. The defendant would change the victims' mailing addresses or place holds on the victims' mail through the U.S. Postal Service, both to further the fraudulent scheme and to conceal their conduct from the victims' families. The defendant and her co-conspirators then deposited checks into victims' accounts, moved money into fraudulently opened accounts, and withdrew the funds. The defendant and her co-conspirators used other stolen identities in order to rent their apartment, to open additional bank accounts, and to rent storage units, where they then stored fake identification cards, stolen mail, stolen access devices, and other documents to further their fraud scheme. The defendant's scheme was quite successful: over the course of just a few weeks following victim D.K.'s death, for example, the defendant and her co-conspirators stole over $140,000 from D.K.'s accounts, money which

GOVERNMENT'S MOTION FOR DETENTION

1 was intended for the care of his orphaned son.

2      Search warrants were executed on the storage units and at one co-conspirator's known home

3 address in February 2020, shortly after the defendant's release from custody following the revocation of

4 her probation in Solano County. Her whereabouts were unknown at that time. The defendant was

5 arrested again in and then transferred between Napa County custody and Contra Costa County custody.

6 She was released from custody pursuant to the state's emergency bail schedule before federal charges

7 could be filed against her. After the Criminal Complaint was filed, the defendant was arrested on the

8 federal warrant following a pretrial hearing in Napa County on October 28, 2020.

9 **ARGUMENT**

10 **I.    LEGAL STANDARDS**

11      The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no

12 condition or combination of conditions will reasonably assure the appearance of the person as required

13 and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is

14 appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to

15 prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant

16 is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C.

17 § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of

18 the evidence. *Motamedi*, 767 F.2d at 1406. "[T]he Bail Reform Act mandates an [1] individualized

19 evaluation [2] guided by the factors articulated in § 3142(g)." *See United States v. Diaz-Hernandez*, 943

20 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized

21 determination, are impermissible. *Id*. Consideration of factors outside the articulated factors set forth in

22 Section 3142 is also disfavored. *Id*.

23      The Court must consider four factors in determining whether the pretrial detention standard is

24 met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the

25 defendant; (3) the history and characteristics of the defendant, including the defendant's character,

26 physical and mental condition, family and community ties, past conduct, history relating to drug or

27 alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as

28 whether the crime was committed while the defendant was on probation or parole; and (4) the nature and

seriousness of the danger to any person or to the community that would be posed by the defendant's

release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## II.    SECTION 3142(G) FACTORS WEIGH IN FAVOR OF DETENTION

Turning first to the nature and circumstances of the charged offense, under § 3142(g)(1), this

factor weighs in favor of detention. Defendant's offense conduct here is incredibly troubling: she was

the ringleader of a group who preyed on recently-deceased victims and their families. She identified

recently-deceased victims by searching obituaries and the internet for people who died suddenly, and

then immediately took over their accounts. She called and wrote to banks pretending to be the deceased,

and she changed the victims' mailing addresses and initiated mail holds, not only to allow her to obtain

mailed checks and access devices, but in order to conceal her actions from the victims' families, who

then had to sort through the messes she left for them after she drained their family members' accounts.[1]

She had no qualms about seeking out victims who died "suddenly," despite the trauma their families

would have already experienced. As described further below, even after draining their accounts, she still

took advantage of these victims and used them for her own gain, even having her friends purport to be

the victims to act as sureties in order to secure her release from custody. The nature of the defendant's

fraud, and the fraudulent activities she continued to conduct even while in custody, weigh heavily in

favor of detention here.

As for the weight of the evidence, under § 3142(g)(2), this factor also favors detention because

the evidence of Defendant's guilt is overwhelming. As described in the Complaint affidavit, evidence of

the scheme was located in the defendant's Google photos and in a storage unit rented by the defendant's

co-conspirator. The defendant is seen on multiple surveillance videos withdrawing stolen funds, using a

stolen identity, and she discussed the scheme on multiple recorded calls while in custody on other

matters. While this factor is deemed the least important by case law, the judge is still "require[d]" to

consider it, and it can help establish dangerousness. *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir.

2008) (finding that "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that

the defendant would pose a danger if released). Likewise, overwhelming evidence of the defendant's

---

[1] D.K.'s brother provided a Victim Impact Statement explaining the suffering the defendant
inflicted on him and his family. The statement will be provided to the Court and to defense counsel.

1  guilt "makes it more likely that [s]he will flee," since the defendant has less incentive to stick around

2  and litigate the case.  *United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991).

3      The defendant's history and characteristics, and the clear danger she poses to the community,

4  considered under §§ 3142(g)(3) and 3142(g)(4), strongly favor detention.

5      **A.    The defendant's history and characteristics demonstrate the substantial risk of flight she poses if released**

6

7      Section 3142(e) is primarily concerned with reasonably assuring the appearance of the defendant

8  so that the judicial proceedings may proceed, and the defendant has, time and again, shown that she will

9  not appear in court as required.  If presented with the opportunity to flee, the defendant's record on her

10  past and pending cases, and while under supervision, strongly indicates that she will do so.

11      The defendant is a prolific identity thief and has built a criminal livelihood by stealing identities

12  and preying on vulnerable victims.  Her criminal history dates back to 1995, when she suffered her first

13  felony convictions for forgery and access device fraud.  She appears to have been convicted of felony

14  theft, forgery and fraud crimes on at least ten occasions since 1995, and has served several state prison

15  sentences.  This includes a 2008 federal conviction in the Eastern District of California False Statements

16  in Loan Applications and Theft of Mail, for which she was initially sentenced to 33 months in custody.

17  For the defendant, identity theft is plainly a way of life.

18      Moreover, the defendant has been undeterred by jail time or probationary sentences.  She has

19  repeatedly violated her probation and parole by committing new crimes, and violated her supervised

20  release from her 2008 federal conviction so egregiously by committing more identity theft crimes that

21  she was sentenced to spend her entire three-year term of supervised release in custody.  She has failed to

22  appear for court on several occasions, and appears to have committed the crime charged in the

23  Complaint while on probation for identity theft crimes.

24      In addition, conditions of release would be difficult to enforce for the defendant.  She has access

25  to fake identification cards and other peoples' identifying information, and as described below, has

26  submitted false documentation to her probation officer and the court previously, so any verification

27  information provided by the defendant would have to be subject to intensive review.  Defendant further

28  has no record of stable housing or employment.  In fact, the defendant has used stolen identities in order

GOVERNMENT'S MOTION FOR DETENTION

to rent apartments, and as described further below, she has faked employment documentation in order to provide to her probation officer.

The Ninth Circuit has discussed the high-level of trust associated with non-custodial conditions of pre-trial release. *Hir*, 517 F.3d at 1092–93. The conditions imposed in *Hir* included: (1) a ban on the possession of firearms; (2) a ban on contact with certain individuals; (3) a ban on certain activities such as sending money overseas; and (4) electronic monitoring. *Id.* at 1092. The Ninth Circuit noted: "Although these proposed conditions of release are strict, they contain one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance." *Id.*

Defendant's record of conduct demonstrates that she will neither heed this Court's orders nor abide by any conditions of release, and she should be detained as a significant flight risk.

**B.      The defendant's history and characteristics demonstrate the substantial danger to the community she poses if released**

Danger to the community is not limited to physical violence. It can take different forms. *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Harris*, No. 18-20343, 2018 WL 3239624, at \*3 (E.D. Mich. July 3, 2018) ("Defendant also allegedly has obstructed justice by attempting to destroy evidence while in jail, which suggests that she would take other illegal actions if released."); S. Rep. No. 98-225 at 12–13 (Senate Judiciary Committee report on Bail Reform Act, stating, among other things, that the Committee "intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). In *Reynolds*, the Ninth Circuit held that the Court can consider the risk of economic danger to the community if the defendant were released, "where there is a showing that defendant's fraudulent activity is ongoing or defendant has a propensity to continue fraudulent activity." *U.S. v. Cohen*, 2010 WL 5387757 at \*9 (N.D. Cal. Dec. 20, 2010).

Here, the defendant's "propensity to continue fraudulent activity" is well-documented. As described above, the defendant has engaged in fraud and identity theft for decades. Significantly, she has continued to engage in this criminal conduct while under supervision, including while on federal supervised release for a fraud-related conviction. Her conduct in the instant matter – the mail fraud

scheme to defraud deceased individuals and their families – appears to have occurred while she was on probation.

Even more significantly, and demonstrative of the danger she poses, the defendant has attempted to continue her fraud even while in custody, both against civilian victims, and against the court. This includes using victims' identities in order to post her bonds. According to records received from Bail Hotline Bail Bonds, on or about May 20, 2018, *while in custody following her arrest for False Personation and Possession of Personal Identifying Information*, the defendant posted a bail bond in Contra Costa County with indemnitor (surety) S.M.[2] S.M.'s driver license and credit card were provided to support the bail bond, as was a purported bank account statement, and S.M.'s personal information was purportedly provided over the phone. Further review, however, makes clear that the defendant used a deceased victim's stolen identity in order to post her bail bond. S.M. had in fact passed away on May 8, 2018, and his obituary had been published in a newspaper a few days later. The bank statement provided with the bail bond paperwork appears to have been altered to add S.M's name and the defendant's UPS Store mailbox address. Whoever had called the bail bondsman on the defendant's behalf had falsely represented themselves to be S.M. in order to secure the defendant's release.

Similarly, while in custody in Napa County in September 2019, as described in the Complaint affidavit, the defendant spoke with co-conspirator Michael McChristian about using deceased victim D.K. as a potential co-signer for her bail bond.[3] The defendant and McChristian eventually settled on having McChristian call a bail bondsman under a different stolen identity, who would pretend to be the defendant's uncle; the defendant then personally called a bail bondsman to advise them to expect a call from her uncle, also falsely referring to McChristian as her brother.

The defendant also induced McChristian to submit false documents to her probation officer and to the court on her behalf, in order to secure her release from custody in Solano County in late 2019. On recorded calls from the Solano County facility where Alexander was held from October 2019 to February 2020, following her release on bond in Napa County, the defendant asked McChristian to

---

[2] These records were provided to the defense as MMDA-1642-1674.

[3] Recorded calls from the defendant's incarceration in Napa County were produced to the defense as MMDA-1675-1685.

create fake paystubs to provide to her probation officer. During calls, she and McChristian discussed what the defendant's role at his company was, what her title was, how much she made – none of which was true, but information which McChristian needed in order to fill in the paystubs. At the defendant's request, McChristian then sent the forged paystubs to the defendant's probation officer, along with a letter she asked him to write, purporting to be her boss. At the defendant's request, McChristian also submitted a letter under a stolen identity to the court, vouching for the defendant as an employee. The defendant knew that these documents would be considered by her probation officer and the court in deciding any sentence for her probation revocation proceedings, which were then pending, and yet she asked her co-conspirator to forge these documents on her behalf in order to expedite her release.

And while in custody, the defendant continued to engage in the fraud with which she is currently charged, and to encourage her co-conspirators to do so as well. While in Solano County custody in November 2019, as described in the Complaint affidavit, the defendant told co-conspirator Roberts about an obituary listed in a local newspaper and to reach out to "Auntie J.H." Given the scheme, the government submits that the defendant was instructing Roberts to locate information for the deceased woman and to take over her accounts, as an individual with a name similar to J.H. had died shortly before the date of the call and whose obituary was listed in the referenced newspaper. The defendant and Roberts spoke about this potential victim on at least two other calls.

Significantly, as described in the complaint affidavit, while in Napa County custody on August 10, 2019, the defendant spoke with McChristian and offered to "write things down" for him and said she would send them in a letter. A week later, McChristian confirmed that he received the defendant's letter. During the execution of a search warrant at McChristian's home on February 21, 2020, law enforcement recovered a handwritten letter next to McChristian's bed in handwriting that appears to belong to the defendant.[4] In the letter, a portion of which is copied below, the defendant instructs McChristian to read obituaries in order to identify potential victims, and to look in local newspapers, on "obituaries.com," or to use a search engine to search for "plane crashes, fires, mass shootings, fatal accidents" and then do further research on the victims of those catastrophes because "sudden death is

---

[4] A copy of this letter was provided to the defense as MMDA-0299-0300.

best." The defendant then listed seven questions to ask about the victim, including whether they "fought to live" or whether they were married. The defendant advised that "[i]f you answered no to all the above, score!," and to look them up on a website where personal identifying information could be purchased. If the answer was yes to any question, however, "skip to the next body." The defendant then provided a lengthy description of how to go about taking over the victims' identities and accounts.

For Sudden death Plane crashes etc Read Articles. Find out
if married call home. See if it Says I or We cant
Answer Phone. google as much as poss ←

Search FOR THEM ON OBITUARIES.COM
OR By going to each cities NEWSPAPER
on line. Such AS
• NAPA Register obits
• EAST BAY obits        etc.
OR on the news. GOOGLE. Plane crashes, FiRes, Fatal
                                MASS shootings,       accidents
SearcH in the Obit FoR THE Following
IF THE Answer to these QuEstions Are
yes. SKip to the next body.

Suddendeath. 5
Suddendeath best

The defendant has gleefully profited off the suffering of victims of "sudden deaths" and their families. Her willingness not only to put herself before the community, but her view of these victims as nothing more than "bodies," makes her particularly dangerous, especially at this point in time. Indeed, the community itself is more vulnerable to the danger posed by Defendant given the COVID-19 pandemic. A staggering number of people have suffered "sudden deaths" due to the pandemic, and the entire country is suffering both emotionally and financially. The government does not yet have evidence that the defendant has preyed on victims of the pandemic, as her home address was unknown to law enforcement and she was arrested leaving a court appearance, after which she gave her cell phone to an acquaintance. However, given her conduct in the very recent past, the risk she poses to the community is too great to be mitigated by any combination of release conditions.

1    Defendant poses a significant danger to the community, a community which is more vulnerable

2  than ever to criminal schemes like those propagated by the defendant.  There are no conditions or

3  combination of conditions that can reasonably mitigate Defendant's risk of flight or dangerousness to

4  the community and she should be detained pending trial.

5                                              **CONCLUSION**

6         For the foregoing reasons, the Court should grant the government's motion to detain defendant

7  Dayna Lyn Alexander, also known as Dayna Lyn Huntsman, pending trial.

8  DATED:  November 5, 2020                              Respectfully submitted,

9                                                        DAVID L. ANDERSON
10                                                       United States Attorney

11                                                        __/s/_____
                                                         SAMANTHA SCHOTT BENNETT
12                                                       Assistant United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28